IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:23-cr-0010 |
| | ) | |
| JERVIN JEROME JEFFERS, | ) | |
| | ) | |
| Defendant. | ) | |

**ATTORNEYS:**

**DELIA L. SMITH, UNITED STATES ATTORNEY**
**EVERARD E. POTTER, ASSISTANT UNITED STATES ATTORNEY**
**ADAM F. SLEEPER, ASSISTANT UNITED STATES ATTORNEY**
UNITED STATES ATTORNEY'S OFFICE
ST THOMAS, U.S. VIRGIN ISLANDS
  FOR PLAINTIFF

**MATTHEW A. CAMPBELL, FEDERAL PUBLIC DEFENDER**
**KIA D. SEARS, ASSISTANT ASSISTANT FEDERAL PUBLIC DEFENDER**
OFFICE OF THE FEDERAL PUBLIC DEFENDER
ST THOMAS, U.S. VIRGIN ISLANDS
  FOR DEFENDANT JERVIN JEROME JEFFERS

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

  **BEFORE THE COURT** is Defendant Jervin Jerome Jeffers' ("Jeffers") Motion to Suppress Physical Evidence and Statements. (ECF No. 34.) Jeffers seeks to suppress the items recovered from his vehicle as well statements he made to law enforcement officers on February 5, 2023. The United States of America (the "Government") opposed the motion. (ECF No. 38.) The Court held an evidentiary hearing on October 27, 2023. The Court issues this Memorandum Opinion explaining its reasons for granting the motion to suppress.

**I.**

  At the evidentiary hearing held on October 27, 2023, the Government presented the testimony of one witness: Virgin Islands Police Department ("VIPD") Officer Roger Arroyo ("Arroyo"). Both parties also introduced exhibits into evidence including the audio of the 9-

1-1 call (Def. Ex. #8), Officer Arroyo's body camera video footage (Gov't Ex. #11), and a Probable Cause Fact Sheet of the incident prepared by Officer Arroyo on February 6, 2023. (Def. Ex #11). In evaluating the evidence admitted at the evidentiary hearing, the Court adduced the following facts.

### A. 9-1-1 Anonymous Call

On February 5, 2023, an operator with the 9-1-1 Emergency Call Center in St. Thomas received an anonymous tip from a male caller who stated that "there's a guy sitting down rolling some weed up in front of Lima's" grocery store in the Bovoni area. (Def.'s Exh. # 8.) The caller said that the reason he was calling was that "he actually placed a gun inside of his vehicle . . . it's a Glock I believe, I'm not sure what generation it is, but it is a Glock." The caller stated the vehicle was a Honda CRV with the license plate TGM-368, and that the person was wearing a camouflage pants and a blue shirt with a white background in the middle and with some orange letters. When the 9-1-1 operator asked for the caller's contact, he stated: "Excuse me?" and "I do not, I am, why should I be contacted about this?" When asked for his name, the caller paused and stated: "My name is John."

### B. Officer Arroyo's Testimony

Officer Arroyo testified that he has been employed by the VIPD for four years, and he is assigned to the Special Operations Bureau ("SOB") handling warrants, special events like J'ouvert, and crimes involving guns and drugs. Arroyo received training through the Police Academy and has the SOB ongoing training every Thursday on all sorts of things such as felony stops, breaching buildings and narcotics detection, including search and recovery of drugs, firearms, and vehicles.

Arroyo testified that, on February 5, 2023, he traveled to the Lima Shopping Plaza area with Lt. Gregory Penn ("Penn") after receiving a 9-1-1 dispatch call that a black male was brandishing a firearm in the vicinity. Arroyo testified that the 9-1-1 dispatcher relayed a description of a dark-color gray SUV, the license plate, and that the vehicle was parked. Arroyo stated that he arrived at the Lima Shopping Plaza area within seconds, saw the vehicle with the license plate described in the 9-1-1 dispatch call, noticed that the lights flashed indicating the vehicle was locked, and informed Penn that somebody just locked the

car. Arroyo testified that he saw the person who fit the description of the male he believed to have been reported to be brandishing the firearm described in the 9-1-1 dispatch call. Arroyo further testified that when he and his partner approached the person, he looked like he was trying to elude them and was acting skittish, so the police handcuffed him. Arroyo testified that the officers informed the person that he was being detained, not arrested, so the police can investigate.

Arroyo testified that he walked around the vehicle described in the 9-1-1 dispatch call, looked through the driver's side window, and saw what he believed to be marijuana on the driver's seat and a little bit of paraphernalia on the passenger seat. Although the front of the window was partially tinted, Arroyo explained that he was able to see inside the vehicle by cupping his hands and using a flashlight. Arroyo testified that, as soon as he saw marijuana, he approached the person – later identified to be Jeffers – and asked if he was the owner of the vehicle. Jeffers stated "no." Arroyo then asked Jeffers if he operated the vehicle and Jeffers answered "yes." Arroyo also testified that, as he looked down, he saw a part of what appeared to be a firearm on the floorboard on the driver's side. He then took the keys from Jeffers, went over to the vehicle, unlocked it, lowered his hand, and moved the seat back to expose the firearm to make sure it was real. From Arroyo's position, he concluded that it was real, without touching it. Arroyo then closed the door, "got out," called forensics to process the vehicle, and walked over to Jeffers and asked him if he had a license to carry a firearm, to which Jeffers responded "no." Arroyo read Jeffers his *Miranda* rights and placed him under arrest. Thereafter, forensics arrived at the scene and collected the firearm after which Arroyo continued his inventory of the vehicle. According to Arroyo, there was a bag with loose money in it on the passenger seat and money on the driver's seat. Some marijuana and baggies were on both driver's and passenger's seats and there was marijuana in a mason glass jar, loose and individually bagged. The mason glass jar was exposed on the passenger's seat. Arroyo testified that he activated his body-worn camera as soon as he saw marijuana and a firearm.

On cross examination, Arroyo testified that he never listened to the anonymous call made to 9-1-1 prior to the evidentiary hearing and he does not recall whether the 9-1-1

dispatcher stated that the man was brandishing a firearm. Arroyo stated that he only remembers traveling to the situation involving a firearm. Arroyo further testified on cross examination that the license plate number that was relayed to him by the 9-1-1 dispatcher matched the vehicle, and he documented that license plate given to him by the 9-1-1 dispatcher in the Probable Cause Fact Sheet ("PCFS") that he prepared. Arroyo also stated he does not remember what Jeffers was wearing that day. He testified that, although VIPD policy requires officers to turn on their body-worn cameras when interacting with citizens if feasible, he did not turn on his body-worn camera when he first encountered Jeffers. Instead, Arroyo testified that he activated his body-worn camera when he saw the marijuana on the seat and the firearm.

On re-direct examination, Arroyo testified that he remembers distinctly that the 9-1-1 dispatcher told the police that the person was wearing a blue shirt with white writing and that was consistent with what Jeffers was wearing. According to Arroyo, when the police came to the scene, Jeffers did not try to move, but when the police went around, he tried to make his way away from the vehicle, kept darting around, and it appeared that he was looking for an opening.

On March 23, 2023, the Government filed a two-count Information charging Jeffers with: (1) alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2); and (2) illegal entry in violation of 8 U.S.C. § 1325(a)(1) and (a)(2). Jeffers seeks to suppress all items recovered as a result of a search of the vehicle as well as any statements provided to law enforcement.

## II.

Jeffers contends that the officers unlawfully searched his vehicle and obtained his statements in violation of *Miranda.* The Government contends that the officers had probable cause to search Jeffers' vehicle under the plain-view doctrine. The Government further contends that the officers had a legal basis to question Jeffers regarding possession of the firearm without having to Mirandize him. The Court addresses these arguments in turn. Since the officers acted in this manner without an arrest or search warrant, the Government bears the burden of demonstrating that the officers acted lawfully in searching Jeffers'

vehicle as well as obtaining his statements. *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) (opining that warrantless searches are presumptively unreasonable); *see also United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (opining that the burden is on the government to demonstrate that warrantless searches and arrests are reasonable under the Fourth Amendment).

A.

First, the Government argues that the officers had the authority to search Jeffers' vehicle under the plain-view doctrine exception to the warrant requirement. "There are three requirements for valid seizures of evidence in plain view. 'First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.' Second, the incriminating character of the evidence must be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object itself.'" *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011).

The Government attempted to establish the elements of the plain-view doctrine with the testimony of its sole witness, Officer Arroyo. However, the Court finds the testimony of Officer Arroyo to be highly problematic. His testimony was inconsistent with the statements he made in his PCFS as well as the events depicted in the body-worn camera video. The Court finds that these inconsistencies rise to a level where the Court is unable to determine the sequence of events justifying the search of the vehicle.

First, Arroyo testified that when he arrived on the scene, he observed a vehicle matching the description from 9-1-1 dispatch, detained Jeffers to gain control of him because he looked skittish and acted like he was going to try to elude the officers, looked inside the vehicle from the driver's side exterior through the tinted window and saw marijuana on the driver's seat and a part of what appeared to be a firearm on the driver's side floorboard.[1] He

---

[1] The Court questions how Officer Arroyo was able to see a "part" of a black firearm on the black floorboard on the driver's side through dark tinted windows from his vantage point. First, it is unclear whether Arroyo looked through the driver's side window (as stated in Arroyo's PCFS) or the passenger side window (as argued by the Government during closing arguments). Regardless of which window Arroyo saw what he believed to be was "part" of a firearm, the photos of the interior of vehicle admitted into evidence demonstrates that it would be highly unlikely that he could identify a firearm by looking through the window. *Compare* Gov't Exh. #4 with Gov't Exh. #2 and #7. The Court is especially skeptical because Officer Arroyo testified that he "exposed the gun

then questioned Jeffers on whether he operated the vehicle, retrieved the keys from Jeffers, unlocked the vehicle and went inside, moved the seat back to expose the gun to make sure it was real. Arroyo then testified that he asked Jeffers if he possessed a firearm license, and then when Jeffers said "no", he placed Jeffers under arrest. Arroyo further testified that he activated his body-worn camera when he saw the marijuana on the seat and the firearm.

However, according to Arroyo's PCFS, Arroyo stated that he "walked directly up to Mr. Jeffers", questioned him as to whether he operated the vehicle, patted him down for officer safety, walked over to the vehicle and after looking through the closed driver-side window . . . and notic[ing] a green leafy substance sitting on the driver-side seat in plain view" as well as "a black firearm on the floorboard of the driver's seat in plain view," asked his partner to detain Jeffers. Arroyo then states in his PCFS that he asked Jeffers if he had a license to carry a firearm legally in the Virgin Islands and when Jeffers stated "No, I do not" Arroyo states that he immediately read Jeffers his rights. Notably, in his PCFS, Arroyo states that he noticed that Jeffers was still holding on to the keys for the vehicle in his left hand, asked him for the keys, and after Jeffers turned them over to him, Arroyo opened the driver's side door to look inside and verify that the firearm was real. Thus, according to Arroyo's PFCS, he retrieved the keys from Jeffers *after* he looked inside the vehicle through the window and asked Jeffers if he had a license to carry a firearm.

The body camera video footage tells a different story. Although Arroyo testified that he turned on the body camera video after seeing the marijuana and the firearm, the body camera video shows Jeffers already in handcuffs and being held by another officer while Arroyo was searching the interior of the vehicle. Also, while Arroyo testified that he retrieved the keys from Jeffers after observing what he believed to be marijuana from the exterior of the vehicle (at which point he testified he activated his body camera) and before he entered the interior of the vehicle, the body camera video shows Arroyo searching the interior of the vehicle after which, he confronts a handcuffed Jeffers and then questions him with regards

---

to make sure it was real" before forensics arrived. Thus, based on Officer Arroyo's testimony coupled with the photos, Officer Arroyo had to move the driver's seat to be able to properly see the firearm.

to whether he had a license to possess a firearm. The body camera video does not show Arroyo retrieving any keys from Jeffers.

Just as the evidence could suggest that Arroyo retrieved the keys from Jeffers after he observed what he believed to be marijuana in the vehicle by looking through the window, the evidence could equally likely suggest that Arroyo retrieved the keys from Jeffers at the initial encounter during the pat-down search and used those same keys to unlock the vehicle and enter its interior to perform a search before observing the marijuana through the window. Arroyo testified that he activated his body-worn camera video when he saw marijuana on the seat and the firearm in the vehicle. The footage from the video first starts with Arroyo searching the interior of the vehicle with the doors open. Moreover, Arroyo testified that he retrieved the keys from Jeffers after he detained him, after which, he then walked around and looked inside the vehicle through the window. This would suggest that Arroyo approached Jeffers **three times**: first – during the initial encounter when he walked up to him and detained him; second – after looking through the driver's side window, seeing the suspected marijuana, and approaching Jeffers to retrieve the keys to the vehicle; and third –after entering the interior of the vehicle to move the driver's seat to verify that the firearm was real and then approaching Jeffers to question him about the firearm and to read him his Miranda rights. Thus, it could be inferred from both Arroyo's testimony and the body camera video footage that Arroyo first discovered the suspected marijuana by opening the door and entering the interior of the vehicle without observing the contraband through the window. This would be considered a Fourth Amendment search, and since the officers did not have a warrant, this search would not be supported by any probable cause and, therefore, would be unconstitutional. *See United States v. Ngumezi*, 980 F.3d 1285, 1289 (9th Cir. 2020) (establishing "a bright-line rule that opening a door and entering the interior space of a vehicle constitutes a Fourth Amendment search.").

This inference is also supported by the fact that Arroyo's PCFS indicates that Arroyo retrieved the keys from Jeffers *after* he discovered the contraband in the vehicle and questioned him about whether he possessed a license to possess a firearm. However, the body camera video does not depict any exchange of keys between Arroyo and Jeffers after

Arroyo searched the interior of the vehicle and questioned Jeffers regarding a firearms license. Moreover, Arroyo testified that the officers detained Jeffers before Arroyo looked inside the vehicle because when they arrived on the scene, he looked skittish and acted like he was going to try to elude them. However, according to the PCFS, Arroyo wrote that the officers detained Jeffers after he looked down at the floor through the closed window of the vehicle and saw the marijuana and a firearm. *See* Def. Ex. #11 (indicating that Arroyo "[a]sked Officer J. Charleswell [to] detain Mr. Jeffers" **after** Arroyo discovered the marijuana and the firearm in the vehicle) (emphasis added).

Based on these numerous inconsistencies, the Court does not credit the testimony of Arroyo that he saw marijuana in the vehicle prior to opening the door and searching the interior of the vehicle. Because the Court is unable to determine the sequence of events that transpired in this case, the Court finds that the Government has not met its burden of demonstrating that the plain-view doctrine applies to the search of the vehicle.

B.

Even if the Court were to credit the testimony of Officer Arroyo – which it does not – the Government still did not demonstrate the second requirement under the plain view doctrine - the incriminating character of the evidence was "immediately apparent."[2]

The Government argued that Officer Arroyo's viewing the marijuana inside the vehicle from the exterior meets this requirement. While Officer Arroyo testified generally that he is trained in narcotics detection, he provided no testimony that he was trained in the detection of marijuana. During his testimony, Arroyo did not identify which window he saw the marijuana on the driver's seat, where he was standing when he saw the marijuana on the driver's seat, or how he was able to identify that it was marijuana on the driver's seat. Arroyo did not provide any testimony as to the form, shape, size, color, or quantity of the marijuana he saw. Apart from general testimony that he has been employed with VIPD for four years and is assigned to the SOB where he handles crimes involving guns and drugs and that he

---

[2] During the hearing, the Government conceded that viewing a firearm inside a vehicle is not incriminating evidence in and of itself. It is well-established that simply possessing a firearm is not a crime in the U.S. Virgin Islands. *See United States v. Ubiles.* 224 F.3d 213, 218 (3d Cir. 2000) It is, however, illegal to possess a firearm in the Virgin Islands without having a valid license to do so. *See* 14 V.I.C. § 2253.

receives an ongoing SOB training every Thursday on all sorts of things, including search and recovery of drugs, Arroyo did not testify about any training or experience in controlled substance identification in general. Nor did he provide any testimony or other evidence of any experience searching for and recovering marijuana, in particular. *See*, *e.g.*, *United States v. Humphries*, 504 F. Supp. 3d 464, 469 (W.D. Pa. 2020) (finding probable cause based on the affidavit of probable cause, in which Officer "Marone set forth his training and experience, including certification as a DANET [District Attorney's Narcotic Enforcement Team] agent with over fifty marijuana arrests."); *United States v. Matthews*, 422 F. Supp. 3d 1235, 1246 (W.D. Ky. 2019) ("Based on the officers' experience with marijuana stops and the similarities between a cigar and a blunt, the Court finds that the officers had probable cause to believe the object they observed from their vantage point outside of Matthews's vehicle was a marijuana blunt."); *States v. Ushery*, 526 F. Supp. 2d 497, 503-04 (M.D. Pa. 2007) (finding probable cause to search the vehicle "based on the smell of burnt marijuana particularized to the passenger compartment of the vehicle" and "the officers' experience in drug enforcement and their frequent encounters with the smell of marijuana," namely "Officer Maley stated that he has participated in hundreds of situations involving the odor of burnt marijuana and recognized it based on this experience. Likewise, Officer Lindsley testified that his many years of drug enforcement work enabled him to identify the odor"); *United States v. Gordon*, No. CRIM.A.04-483, 2004 WL 2905249, at *3 (E.D. Pa. Dec. 15, 2004) (finding there was probable cause to search the vehicle based on the officer's training and experience, including that "[p]rior to the arrests of Mr. Gordon and Mr. Grant on June 6, 2004, Officer Herncane had made approximately 30–40 marijuana-related arrests" and "[o]f those arrests, approximately 2–5 involved situations where Officer Herncane was able to detect the presence of raw marijuana by himself, without the assistance of a K–9 dog"). Under the totality of the circumstances, the Court finds that, at the time he saw what he believed to be marijuana, Arroyo did not have probable cause to believe that the vehicle contained contraband or evidence of a crime. *Coolidge*, 403 U.S. at 468. (explaining that "plain view alone is never enough to justify the warrantless seizure of evidence").

C.

Turning to Jeffers' statements, Jeffers argues that his statements were obtained without the benefit of Miranda warnings in violation of the Fifth Amendment because he was detained by another officer and not free to leave or terminate interrogation when Arroyo questioned him. The Government contends that Jeffers was not under arrest nor was he subject to restraint or to custodial interrogation when he was questioned.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. When a person "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," the right against self-incrimination requires that procedural safeguards be employed, including advising the person of the right to remain silent and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). To determine whether a person is in custody, courts must "ascertain whether, in light of 'the objective circumstances of the interrogation' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citations omitted). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). Courts consider various factors to determine if a person was in custody, including: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." *Id.* at 359-60.

When Arroyo activated his body-worn camera, he is seen standing next to the open driver's door of the vehicle Jeffers was operating and the video recording shows that Jeffers was standing on the sidewalk, his hands already handcuffed behind his back, and he was physically restrained by an armed officer standing right behind him and holding Jeffers with one of his hands. Apart from the armed officer holding Jeffers who is handcuffed, the video

shows another armed officer standing near Jeffers when Arroyo approached to ask Jeffers whether he had a license to carry a firearm. According to Arroyo's testimony, the officers detained Jeffers to prevent him from leaving the area because he looked like he was going to try to elude the officers and was acting skittish. Although Arroyo testified that Jeffers was advised by the officers that he was only detained so the police can investigate and was not under arrest when he was handcuffed, no evidence corroborates that testimony, and to the contrary, Arroyo testified that he detained Jeffers to prevent him from leaving.

Moreover, Arroyo testified that he traveled to the Lima Shopping Plaza area to investigate reports of a person brandishing a firearm. When Arroyo arrived at the Lima shopping area, he engaged in no activities to confirm or dispel his suspicions. Instead, Officer Arroyo detained Jeffers because he observed him using his key fob to lock the doors to his vehicle and tried to leave the area.[3] The officers detained Jeffers throughout the entirety of

---

[3] The Court also concludes that the information provided by the anonymous caller to 9-1-1 did not provide reasonable suspicion to detain Jeffers. It is undisputed that law enforcement officers may perform an investigative stop on an individual when justified by reasonable suspicion that an individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968). When assessing whether an anonymous tip is sufficiently reliable to justify a *Terry* stop, the Court must consider the following factors:

> 1) Whether the tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation; (2) Whether the person providing the tip can be held responsible if her allegations turn out to be fabricated; (3) Whether the content of the tip is not information that would be available to any observer; (4) Whether the person providing the information has recently witnessed the alleged criminal activity; and (5) Whether the tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility[.]

*United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (quoting *United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008)).

While the circumstances surrounding the 9-1-1 call indicate that the person providing the information recently witnessed the events, the other factors are not met in this case. First, the information provided by the tipster was not through a face-to-face interaction with law enforcement. *See J.L.,* 529 U.S. at 276 (explaining that, "[i]f an informant places his anonymity at risk," an anonymous tip might be sufficiently reliable to justify a proportionate police response when the unnamed person, informs the police that criminal activity is occurring "face to face"). Second, the person providing the information was hesitant and refused to give his information to emergency dispatch and gave the generic name of "John" to the 9-1-1 operator. Black's Law Dictionary (11th ed. 2019) (providing that the pseudonym of "John Doe," is a "fictitious name used in a legal proceeding to designate a person whose identity is unknown.") Thus, the person providing the information could not be held responsible if the allegations turn out to be fabricated. *See United States v. Brown*, 448 F.3d 239, 250 (3d Cir. 2006) (explaining that, where the call was not anonymous, "the police would certainly have been able to find him and hold him accountable had his tip proved to be inaccurate"); *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002) ("one of the characteristics of a known informant that contributes to reliability

the encounter and made no efforts to confirm or dispel any suspicion that Jeffers illegally brandished a firearm or possessed a firearm illegally. This detention rendered the stop

---

is that he or she can be held responsible if the allegations turn out to be fabricated"). Third, it appears that the content of the tip would be available to any person who was present at the Lima shopping area and thus, available to any observer. The tipster stated: "there's a guy sitting down rolling some weed up in front of Lima's" grocery store and he "placed a gun inside of his vehicle," "it's a Glock I believe, I'm not sure what generation it is, but it is a Glock," the vehicle was a Honda CRV with the license plate TGM 368, and the person was wearing a camouflage pants and a blue shirt with a white background in the middle and with some orange letters. The content of the tip in this case is information that would be readily available to any observer who had observed the same occurrence contemporaneously with the anonymous tipster. *United States v. Lyons*, No. 2:18-CR-00171, 2020 WL 429112, at *9 (W.D. Pa. Jan. 28, 2020) (finding that "the content of the tip could have been gathered by anyone who happened to see the Defendant standing outside at the side door"). Finally, the tip did not predict any future activity. *See, e.g., United States v. Bradley*, No. 1:20-CR-220, 2022 WL 16748606, at *4 (M.D. Pa. Nov. 7, 2022) ("The source accurately predicted Bradley's future behavior by identifying the specific time and day of the week that Bradley would leave his home alone in his Prius and drive the back roads toward Baltimore" and that "Bradley would stop along the way, in locations such as shopping centers, to sell cocaine to customers near Parkville," which was "validated by Bradley's rendezvous in the feedstore parking lot, an interaction which Toland credibly testified to be consistent with a drug sale based on his extensive narcotics investigation experience."); *United States v. Roberson*, 90 F.3d 75, 79 (3d Cir. 1996) ("Anyone could have 'predicted'' the facts contained in the tip because they were 'condition[s] presumably existing at the time of the call.'") (quoting W*hite,* 496 U.S. at 332). The Court finds that this factor weighs against finding of reliability. Accordingly, the Court concludes that the tip did not provide a sufficient indicium of reliability providing the officers with a reasonable suspicion that criminal activity was afoot.

Although it appears that the anonymous tipster in this case reported in his 9-1-1 call what he observed contemporaneously, he did not state that he recently witnessed any alleged criminal activity because placing a gun inside the vehicle, which is what the anonymous tipster reported, is not a crime in the Virgin Islands. Moreover, the anonymous tip that "there's a guy sitting down rolling some weed up in front of Lima's" grocery store, is not sufficient to suggest criminal activity because the tipster did not indicate the basis for his allegation that the rolling involved weed rather than a lawful substance, such as tobacco. *J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."); *United States v. Torres*, 341 F. Supp. 3d 454, 466 (M.D. Pa. 2018) (finding that "the tip was provided by an eyewitness who recently witnessed the alleged criminal activity," namely, the eyewitness saw that the person "fired two rounds" into the building, "as demonstrated by Officer Pickel's account of his conversation with the eyewitness, which affords the tip greater weight for purposes of the instant analysis").

Based on the analysis of the relevant factors and the totality of the circumstances in this case, the Court finds that the officers did not have reasonable suspicion of criminal activity to stop and detain Jeffers based on the anonymous tip because the anonymous tip did not show sufficient indicia of reliability required to justify a stop under the reasonable suspicion standard. *United States v. Parker*, 467 F. App'x 120, 122 (3d Cir. 2012) ("When reasonable suspicion is based on information obtained from an anonymous source, the tip must exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop' without further independent investigation.") (quoting *White,* 496 U.S. at 332). Therefore, the officers were required to conduct further independent investigation to confirm or dispel any suspicion of criminal activity reported in the anonymous tip.

unconstitutional and in violation of the Fourth Amendment. *See Hurtt*, 31 F.4th 152, 162 (3d Cir. 2022).

Under these circumstances, the Court finds that Jeffers was seized and in custody because he was not free to leave and did not voluntarily submit to questioning. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("[F]or there to be a seizure, the police must apply physical force to the person being seized, or where force is absent, have the person seized submit to a show of police authority"); *United States v. Aker*, No. CV 3:16-CR-00206, 2018 WL 501001, at *7 (M.D. Pa. Jan. 22, 2018) ("A reasonable person in Aker's position would have felt as if she was either under arrest or could have been placed under arrest at any moment.").

The video from Arroyo's body camera shows that Arroyo asked Jeffers whether he had a license to carry a firearm while Jeffers was in custody and before Arroyo administered *Miranda* warnings. The Court finds that eliciting incriminating statements from Jeffers without procedural safeguards of *Miranda* while he was in custody violated Jeffers's Fifth Amendment right, warranting the suppression of those statements.

### III.

For the foregoing reasons, the Court finds that no reasonable suspicion justified the investigative stop, the plain-view exception to the warrant requirement does not apply, and the pre-*Miranda* statements constitute both the fruit of the poisonous tree and custodial interrogation in violation of the Fifth Amendment.

**Date:** June 26, 2024      /s/ *Robert A. Molloy*
                             **ROBERT A. MOLLOY**
                             **Chief Judge**